UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **GLADYS ROBINSON, INDIVIDUALLY** | § | |
| **AND ON BEHALF OF THE ESTATE** | § | |
| **OF BETTY BATTLE, DECEASED,** | § | |
| | § | **Civil Action No. 4:12-cv-1456** |
| **Plaintiffs,** | § | **(Jury)** |
| **vs.** | § | |
| | § | |
| **MARINER HEALTH OF SOUTHWEST** | § | |
| **HOUSTON ET AL** | | |

FIRST AMENDED COMPLAINT

## I.  NATURE OF THE SUIT

1.      This is a suit to enforce a judgment, recover damages, avoid fraudulent transfers and set aside fraudulent obligations pursuant to Texas law, including the Texas Uniform Fraudulent Transfer Act.

2.      Plaintiff seeks to enforce a judgment previously obtained against the negligent operator of the nursing home responsible for causing Betty Battle to suffer physical injuries from pressure ulcers ("bed sores") before she died.  ("Battle Judgment").  At the time of her suffering, Betty Battle was a resident of a nursing home operated by an entity controlled by Mariner Health Care, Inc., ("Mariner" or "MHC").  MHC was a public company before it was purchased in December 2004 as part of a "leveraged buyout" (the "Mariner LBO").  The Mariner LBO involved individuals and entities controlled by Rubin Schron.  The operator of the shell company ("Mariner Nashville") that remained for a time after the Mariner LBO has maintained that it cannot pay the Battle Judgment because to do so would render it insolvent.  Investigation and newly revealed information establishes, however, that the Defendants here deliberately and purposefully caused Mariner Nashville's insolvency in order to benefit themselves at the expense of their creditors through a Leveraged Buyout ("LBO") of Mariner's assets.

3.     Typically, the details behind LBOs and the layers of interlocking entities remain a mystery to the public.  But on August 4, 2010, in a ninety six page sworn civil complaint, Rubin Schron testified that he financed and controlled the Mariner LBO, and acknowledged that he acquired Mariner's most valuable assets through the LBO, the real estate it owned.  Schron also said that side agreements and obligations existed—agreements that if they exist were, before 2010, secret—whereby Schron (and various entities controlled by him) controlled and continue to control the individuals running the former Mariner nursing homes' operations that resulted in Betty Battle's injuries.  Pursuant to these previously undisclosed secret agreements and arrangements, Schron (and entities that Schron and his family members control ("Schron Entities")) acquired all of the valuable real property assets of Mariner and its subparts through joint compensation structures and fiduciary obligations that Schron swore were owed by nursing home operating companies to him.  All the while, Schron and Schron Entities led courts, regulators and creditors to believe that the entities operating these nursing homes were independent of their landlords—Schron and Schron Entities.

4.     Under oath, Schron acknowledged that he acquired Mariner's most valuable assets during Mariner's LBO, a transaction called by the attorneys involved as one of the most complicated transactions imaginable.  And yet, according to Schron, his New York case against former business associates is not about how he and conspirators managed to strip the former Mariner of its value, but how he should have secured even more money from Mariner's operations—and eventually even Mariner's former operations (which appear to have been divided among entities known as the "new" Mariner and Sava), as a result of secret promises he secured during Mariner's LBO.  According to Schron, he—not Mariner's creditors—was "systemic[ally] exploit[ed] by self-interested attorneys and bankers of clients [Schron and Schron Entities] who

2

entrusted the operators (his attorneys and bankers, says Schron) to devise and implement the terms of complex business deals that these [attorneys and bankers] arranged and advocated for their clients (Schron and Schron Entities).  Rather than vindicating their clients' trust or abiding by the terms of agreements they drafted, Schron has testified that attorney Leonard Grunstein ("Grunstein"), his longtime business partner, Murray Foreman ("Forman"), and certain of their colleagues, including law firms of which Grunstein was a partner and businesses that Grunstein and Foreman controlled, have repeatedly breached fiduciary duties owed to the Schron, the supposed landlord, in order to advantage themselves at their clients' expense.  These are the very same people who, as Schron acknowledges he knew, were running nursing homes' operations after the operators of Mariner's facilities became Schron's tenants through the Mariner LBO.  This egregious course of conduct has caused **_hundreds of millions of dollars_** of damages to Schron and the Schron Entities.  *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶1).

5.     As shown herein, Schron and Schron Entities purchased and directed the purchase and disposition of assets formerly owned by Mariner and the Mariner entities that were defendants in the underlying negligence action.  Mariner assets should have remained available to satisfy the known and likely creditors, including the judgment Plaintiffs secured on behalf of the Estate of Betty Battle, Deceased.  Instead, Schron and Schron Entities systematically stripped valuable assets from the judgment debtor via secret, conflicted and below fair market transactions designed and intended as mechanisms to provide windfalls to Schron and Schron Entities, to the obvious detriment of legitimate judgment creditors, including Plaintiffs here.

## II.  JURISDICTION AND VENUE

6.     Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because the Plaintiffs are residents of a different state from the Defendants and because the value of the matter in

controversy exceeds $75,000 (excluding interest and costs).  All Plaintiffs are citizens of the State of Texas because at all relevant times they are natural persons permanently domiciled in the State of Texas by virtue of having established a fixed habitation or abode intending to remain there permanently or indefinitely.  None of the Defendants is a citizen of the State of Texas. None of the entities were created under the laws of the State of Texas and none of the Defendants have their principal place of business in the State of Texas based on the "nerve center" test promulgated by the Supreme Court of the United States in  Hertz Corp. v. Friend, ___ U.S. ___, 130 S. Ct. 1181, 1192 (2010).  Therefore, complete diversity of citizenship exists between all Plaintiffs and all Defendants.  In summary, Plaintiffs are citizens of Texas only.  None of the Defendants is a citizen of Texas. Defendants are only citizens of Delaware, New York and Georgia.  Please see more specific facts pleaded as to the citizenship of each party appearing below.

7.     The court has personal jurisdiction over Plaintiffs by virtue of Plaintiffs filing this Complaint with the Clerk of the Court.  The Court has personal jurisdiction over Defendants pursuant to proper service of summons with a copy of this Complaint, the fact that Defendants do business in the State of Texas on a regular basis, have committed a tort in the State of Texas and have otherwise engaged in conduct whereby Defendants could reasonably be expected to be hailed into court in the State of Texas consistent with applicable constitutional standards. Contemporaneously with the filing of this Complaint, Plaintiffs present summons for Defendants and asks the Clerk to place the official seal thereon and return same to the undersigned counsel so that all process documents can be properly forwarded to a person authorized to perfect service under Texas law and service diligently pursued until perfected.

8.      Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions on which the claims are based occurred in the Southern District of Texas and in the Houston Division.

### III. PARTIES

9.      Gladys Robins is a natural person and resided in Harris County, Texas at the time the cause of action that is the basis of this suit accrued.  She is the natural daughter and heir of Betty Battle and authorized to bring this action on behalf of the Estate of Betty Battle, Deceased ("the Estate") and all survival action beneficiaries; to wit:   Robert Charles Robin, Sandra Jean McGowan, Lucille Marie Brown, Dexter Leon Battle.   No probate proceedings have been initiated because the only asset of the Estate is the Battle Judgment and there are no debts to pay. All the heirs of the Estate have agreed that Gladys Robins is authorized to act on behalf of the Estate and on behalf of all of the heirs of the Estate.   Therefore, she is fully vested with the authority to prosecute this action in all relevant capacities.  All the heirs of the Estate are listed herein.  There are no other heirs of the Estate.  As well, all heirs of the Estate have hired the undersigned counsel in their capacity as heirs of the Estate such that this Honorable Court has all necessary and indispensable plaintiff parties to this action before it.  Betty Battle died without a will.  Betty Battle died as a single person.  Betty Battle never adopted any children.  The surviving children and sole heirs of Betty Battle are Gladys Robins, Robert Charles Robin, Sandra Jean McGowan, Lucille Marie Brown and Dexter Leon Battle.  Gladys Robins is a Texas citizen.

10.     Robert Charles Robin is a natural person and resided in Harris County, Texas at the time the cause of action that is the basis of this suit accrued.  He is the natural son and heir of Betty Battle.  Robert Charles Robin is a Texas citizen.

5

11.    Sandra Jean McGowan is a natural person and resided in Harris County, Texas at the time the cause of action that is the basis of this suit accrued.  She is the natural daughter and heir of Betty Battle.  Sandra Jean McGowan is a Texas citizen.  Sandra Jean McGowan is a Texas citizen.

12.    Lucille Marie Brown is a natural person and resided in Harris County, Texas at the time the cause of action that is the basis of this suit accrued.  She is the natural daughter and heir of Betty Battle.  Lucille Marie Brown is a Texas citizen.

13.    Dexter Leon Battle is a natural person and resided in Harris County, Texas at the time the cause of action that is the basis of this suit accrued.  He is the natural son and heir of Betty Battle.  Dexter Leon Battle is a Texas citizen.

14.    MARINER HEALTH OF SOUTHWEST HOUSTON ("Mariner Southwest") is an entity that appeared to defend against the underlying negligence case for all purposes.  Mariner Southwest was created under the laws of Delaware and registered to do business in Texas, and was listed as Grantor in a deed dated December 10, 2004, granting premises commonly known by the street address of 8820 Town Park Drive, Houston, Texas 77036 to SMV Houston Southwest LP, having an office at c/o Cammeby's International, Ltd., 45 Broadway, 25th Floor, New York, New York, 10006.  Mariner Southwest is an assumed name of Mariner Health Care of Nashville, Inc.  Mariner Southwest may be served with process via its agent for service of process CT Corporation System at 350 N. St. Paul Street, Suite 2900, Dallas, TX 75201-4234.  Mariner Southwest is a citizen of Delaware by incorporation and a citizen of Georgia by the locale of its principal place of business via the "nerve center" test.  Mariner Southwest is not a citizen of the State of Texas.

15.     MARINER HEALTH CARE OF NASHVILLE, INC. ("Mariner Nashville") is a Delaware Corporation having its principle place of business at One Ravinia Drive, Suite 1500, Atlanta, Georgia, 30346.  Mariner Nashville may be served with process via its agent for service of process CT Corporation System at 350 N. St. Paul Street, Suite 2900, Dallas, TX 75201-4234. Mariner Southwest is a citizen of Delaware by incorporation and a citizen of Georgia by the locale of its principal place of business via the "nerve center" test.  Mariner Southwest is not a citizen of the State of Texas.

16.     SSC HOUSTON SOUTHWEST OPERATING COMPANY LP ("SSC Houston") is a limited liability company organized under the laws of the State of Delaware that, in August 2004, registered to transact business related to "Skilled Nursing Facilities" in the State of Texas pursuant to Article 7.05 of the Texas Limited Liability Company Act.  The August 2004 application lists the section 7.05 applicant as "SSC Houston Southwest Operating GP LLC" and the manager of the LLC as Harry Grunstein of Sparks, Maryland.  SSC Houston may be served with process via its agent for service of process CT Corporation System at 350 N. St. Paul Street, Suite 2900, Dallas, TX 75201-4234.  SSC Houston is a citizen of Delaware by incorporation and a citizen of Georgia by the local of its principal place of business via the "nerve center" test. SSC Houston is not a citizen of the state of Texas.  None of SSC Houston's members is a Texas citizen.  If SSC Houston is a partnership, its general partner and all of its members were created under the laws of other states other than Texas and they all have their principal place of business outside the State of Texas.  Therefore, SSC Houston as a partnership is not a citizen of the State of Texas.  Carden v. Arkoma Assocs, 494 U.S. 185, 195-96 (1990).

17.     SSC HOUSTON SOUTHWEST OPERATING GP LLC ("SSC GP") is a limited liability company organized under the laws of the State of Delaware and is the general partner of SSC

7

Houston.   SSC GP may be served with process via its agent for service of process CT Corporation System at 350 N. St. Paul Street, Suite 2900, Dallas, TX 75201-4234.  SSC GP is a citizen of Delaware by incorporation and a citizen of Georgia by the local of its principal place of business via the "nerve center" test.  SSC GP is not a citizen of the State of Texas.  None of SSC GP's members is a Texas citizen.  If SSC GP is a partnership, its general partner and all of its members were created under the laws of other states other than Texas and they all have their principal place of business outside the State of Texas.  Therefore, SSC GP as a partnership is not a citizen of the State of Texas.  Carden v. Arkoma Assocs, 494 U.S. 185, 195-96 (1990).

18.    SVCARE HOLDINGS LLC ("SVCARE") is a Delaware limited liability company with its principal place of business at 291 Ocean Avenue, Lawrence, New York.  It is wholly owned by Canyon Sudar.  SVCARE is a holding company that directly owns (or appears to own) Sava. Sava is an entity that operates nursing homes acquired by Schron and Schron Entities during the Mariner LBO, including the Houston, Texas nursing home where Ms. Battle suffered and died. According to Schron, he also owns Sava through exercise of a secret option he obtained in as part of Mariner's 2004 LBO.  By operation of law, SVCARE has designated the Texas Secretary of State as its agent for service of process.  Accordingly, SVCARE may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079.  The Texas Secretary of State may then forward the process documents on to SVCARE at SVCARE's Headquarters at 291 Ocean Avenue, Lawrence, New York.  Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means.  All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met.   Upon receipt of such process, the Secretary of State of the State of Texas is hereby

8

requested to serve SVCARE pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to SVCARE at its home office, to wit: SVCARE's Headquarters, 291 Ocean Avenue, Lawrence, New York 11559-2010.  SVCARE is a citizen of Delaware by incorporation and a citizen of New York by the local of its principal place of business via the "nerve center" test.  SVCARE is not a citizen of the State of Texas.

19.     SAVASENIORCARE LLC ("Sava") is a Delaware limited liability company with its principle place of business at One Ravinia Drive, Suite 1500, Atlanta, Georgia.  Sava was wholly owned by SVCARE.  As set forth below, however, according to Schron, Sava is actually owned by Schron or Schron Entities pursuant to the terms of a secret option he holds and has or intends to exercise.  By operation of law, Sava has designated the Texas Secretary of State as its agent for service of process.  Accordingly, Sava may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079.  The Texas Secretary of State may then forward the process documents on to SAVA at SAVA's Headquarters at One Ravinia Drive, Suite 1500, Atlanta, Georgia 30346-2115.  Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means.  All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met.  Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve Sava pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to Sava at its home office, to wit:  Sava's Headquarters, One Ravinia Drive, Suite 1500, Atlanta, Georgia.  Sava is a citizen of Delaware by incorporation and a citizen

of Georgia by the local of its principal place of business via the "nerve center" test. Sava is not a citizen of the State of Texas.

20.    RUBIN SCHRON ("Schron") is a resident of Brooklyn, New York.  He is self-reported to be a "successful real estate investor [whose] investments typically are held in various entities controlled by him and/or members of his family."  *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶30).  Schron is a natural person domiciled in the state of New York by virtue of having established a fixed habitation or abode intending to remain there permanently or indefinitely.  Therefore, Schron is a citizen of the state of New York.  Schron is not a citizen of the state of Texas.  By operation of law, Schron has designated the Texas Secretary of State as its agent for service of process.  Accordingly, Schron may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079.   The Texas Secretary of State may then forward the process documents on to Schron at Schron's office at 45 Broadway, New York, New York 10006.  Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means.  All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met.  Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve Schron pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to Schron at his home office, to wit: Schron's home office, 45 Broadway, New York, New York 10006.

21.    CAM-ELM COMPANY, LLC ("Cam-Elm") is a New York limited liability company with its principal place of business at 45 Broadway, New York, New York.  Cam-Elm is 100%

owned by members of the SCHRON family.  Cam-Elm holds the SCHRON family's interests in numerous real estate and other investments.  *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶31).  By operation of law, Cam-Elm has designated the Texas Secretary of State as its agent for service of process.  Accordingly, Cam-Elm may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079.  The Texas Secretary of State may then forward the process documents on to Cam-Elm at Cam-Elm's Headquarters at 45 Broadway, New York, New York. Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means.  All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met.  Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve Cam-Elm pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to Cam-Elm at its home office, to wit:  Cam-Elm's Headquarters, 45 Broadway, New York, New York 10006.  Cam-Elm is a citizen of New York by incorporation and a citizen of New York by the local of its principal place of business via the "nerve center" test.  Cam-Elm is not a citizen of the State of Texas.

22.    SMV PROPERTY HOLDINGS LLC ("SMV") is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York.  SMV owns or controls certain real estate properties acquired in the Mariner LBO, described below.  Schron is the sole manager of SMV.  Cam-Elm currently holds a 69.615% ownership interest in SMV.  The remaining 30.385% is owned by Mada (3.4425%), Cada (3.4425%), Mich II Holdings LLC ("Mich II") (2.25%), Seeva II Holdings LLC ("Seeva II") (11.25%), Sam Domb (5%) and Dlo Barad (5%).  Mich

II and Seeva II are majority-owned by Grunstein and Forman. *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶33). By operation of law, SMV has designated the Texas Secretary of State as its agent for service of process. Accordingly, SMV may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079. The Texas Secretary of State may then forward the process documents on to SMV at SMV's Headquarters at 45 Broadway, New York, New York. Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means. All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met. Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve SMV pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to SMV at its home office, to wit: SMV's Headquarters, 45 Broadway, New York, New York 10006. SMV is a citizen of Delaware by incorporation and a citizen of New York by the local of its principal place of business via the "nerve center" test. SMV is not a citizen of the state of Texas.

23.     SMV SPECIAL HOLDINGS, LLC ("SMV Special Holdings") is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York. SMV Special Holdings is owned by Cam-Elm (77.35%) Mada (3.825%), Cada (3.825%), Mich II (2.5%) and Seeva II (12.5%). SMV Special Holdings was formed to act as the sole equity member of limited liability companies and limited partnerships that own fee interests and leasehold interests associated with nursing home or long-term care facilities and, to hold directly or through affiliates other assets, contract rights and service and product opportunities relating to certain entities. *See* Exhibit 1

(Schron's Amended Verified Complaint, ¶35).  By operation of law, SMV Special Holdings has designated the Texas Secretary of State as its agent for service of process.  Accordingly, SMV Special Holdings may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079.  The Texas Secretary of State may then forward the process documents on to SMV Special Holdings at SMV Special Holdings' Headquarters at 45 Broadway, New York, New York.  Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means.  All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met.  Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve SMV Special Holdings pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to SMV Special Holdings at its home office, to wit:  SMV Special Holdings' Headquarters, 45 Broadway, New York, New York 10006.  SMV Special Holdings is a citizen of Delaware by incorporation and a citizen of New York by the local of its principal place of business via the "nerve center" test.  SMV Special Holdings is not a citizen of the State of Texas.

24.    CAMMEBY'S EQUITY HOLDINGS LLC ("Cam Equity") is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York.  Cam Equity is owned by Cam-Elm (77.35%), Mada (3.825%), Cada (3.825%), Mich II (2.5%) and Seeva II (12.5%).  Cam Equity was created to hold various option rights arising from the Mariner LBO, including the Amended SVCARE Option that SCHRON says he secured, discussed below.  *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶36).  By operation of law, Cam Equity has

13

designated the Texas Secretary of State as its agent for service of process.  Accordingly, Cam Equity may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079.  The Texas Secretary of State may then forward the process documents on to Cam Equity at Cam Equity's Headquarters at 45 Broadway, New York, New York 10006.  Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means.  All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met.  Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve Cam Equity pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to Cam Equity at its home office, to wit:  Cam Equity's Headquarters, 45 Broadway, New York, New York 10006.  Cam Equity is a citizen of Delaware by incorporation and a citizen of New York by the local of its principal place of business via the "nerve center" test. Cam Equity is not a citizen of the State of Texas.

25.     CAMMEBY'S FUNDING II LLC ("Cam Funding II") is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York.  Cam Funding II is owned by Cam-Elm (77.35%), Mada (3.825%), Cada (3.825%), Mich II (2.5%) and Seeva II (12.5%).  Cam Funding II was created to serve as a funding entity in the Mariner LBO.  *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶38).  By operation of law, Cam Funding II has designated the Texas Secretary of State as its agent for service of process.  Accordingly, Cam Funding II may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079.  The Texas

Secretary of State may then forward the process documents on to Cam Funding II at Cam Funding II's headquarters at 45 Broadway, New York, New York. Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means. All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met. Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve Cam Funding II pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to Cam Funding II at its home office, to wit: Cam Funding II's Headquarters, 45 Broadway, New York, New York 10006. Cam Funding II is a citizen of Delaware by incorporation and a citizen of New York by the local of its principal place of business via the "nerve center" test. Cam Funding II is not a citizen of the state of Texas.

26. CAMMEBY'S FUNDING III LLC ("Cam Funding III") is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York. Cam Funding III is owned by Cam-Elm (77.35%), Mada (3.825%), Cada (3.825%), Mich II (2.5%) and Seeva II (12.5%). Cam Funding III was created to serve as a funding entity in the Mariner LBO. *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶39). By operation of law, Cam Funding III has designated the Texas Secretary of State as its agent for service of process. Accordingly, Cam Funding III may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079. The Texas Secretary of State may then forward the process documents on to Cam Funding III at Cam Funding III's headquarters at 45 Broadway, New York, New York. Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026

15

and other lawful means.  All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met.  Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve Cam Funding III pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to Cam Funding III at its home office, to wit:  Cam Funding III's Headquarters, 45 Broadway, New York, New York 10006.  Cam Funding III is a citizen of Delaware by incorporation and a citizen of New York by the local of its principal place of business via the "nerve center" test.  Cam Funding III is not a citizen of the State of Texas.

27.    CAMFIVE HOLDINGS, LLC ("CAMFIVE") is a Delaware limited liability company with its principal place of business at 45 Broadway, New York, New York.  CAMFIVE is owned by Cam-Elm (77.35%), Mada (3.825%), Cada (3.825%), Mich II (2.5%) and Seeva II (12.5%).  CAMFIVE was created to serve as a funding entity in the 2006 SMV/SWC refinancing, discussed below.  *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶40).  By operation of law, CAMFIVE has designated the Texas Secretary of State as its agent for service of process.  Accordingly, CAMFIVE may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079.  The Texas Secretary of State may then forward the process documents on to CAMFIVE at CAMFIVE's Headquarters at 45 Broadway, New York, New York 10006.  Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means.  All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met.  Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve CAMFIVE pursuant to TEX.

CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to CAMFIVE at its home office, to wit:  CAMFIVE's Headquarters, 45 Broadway, New York, New York 10006.  CAMFIVE is a citizen of Delaware by incorporation and a citizen of New York by the local of its principal place of business via the "nerve center" test. CAMFIVE is not a citizen of the State of Texas.

28.     CAMMEBY'S MANAGEMENT CO. LLC ("Cam Mgmt.") is a New York limited liability company with its principal place of business at 45 Broadway, New York, New York.   Upon information and belief, SCHRON controls Cam Mgmt.  *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶41).  By operation of law, Cam Mgmt. has designated the Texas Secretary of State as its agent for service of process.   Accordingly, Cam Mgmt. may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079.   The Texas Secretary of State may then forward the process documents on to Cam Mgmt. at Cam Mgmt.'s Headquarters at 45 Broadway, New York, New York 10006.  Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means.   All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met. Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve Cam Mgmt. pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to Cam Mgmt. at its home office, to wit:  Cam Mgmt.'s Headquarters, 45 Broadway, New York, New York 10006.  Cam Mgmt. is a citizen of New York

by incorporation and a citizen of New York by the local of its principal place of business via the "nerve center" test. Cam Mgmt. is not a citizen of the State of Texas.

29.     The above entities and person have appeared in this case for all purposes subject to motions. Accordingly, a true and correct copy of this pleading is being served upon these parties as indicated on the Certificate of Service attached hereto.

30.     CAMMEBY'S INTERNATIONAL, LTD. ("Cam Int'l") is an entity with its principal place of business at 45 Broadway, New York, New York. Upon information and belief, SCHRON controls Cam Int'l. *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶42). By operation of law, Cam Int'l has designated the Texas Secretary of State as its agent for service of process. Accordingly, Cam Int'l may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079. The Texas Secretary of State may then forward the process documents on to Cam Int'l at Cam Int'l's Headquarters at 45 Broadway, New York, New York 10006. Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means. All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met. Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve Cam Int'l pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to Cam Int'l at its home office, to wit: Cam Int'l's Headquarters, 45 Broadway, New York, New York 10006. Cam Int'l is a citizen of a state other than Texas by incorporation and a citizen of New York by the local of its principal place of business via the "nerve center" test. Cam Int'l is not a citizen of the State of Texas.

18

31.     MHC Texas Holding Company, LLC ("MHC Texas") is a Delaware limited liability company with its principle place of business at One Ravinia Drive, Suite 1500, Atlanta, Georgia. By operation of law, MHC Texas has designated the Texas Secretary of State as its agent for service of process.   Accordingly, MHC Texas may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079.   The Texas Secretary of State may then forward the process documents on to MHC Texas at MHC Texas's Headquarters at One Ravinia Drive, Suite 1500, Atlanta, Georgia 30346-2115.   Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means.   All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met.   Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve MHC Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to MHC Texas at its home office, to wit:  MHC Texas's Headquarters, One Ravinia Drive, Suite 1500, Atlanta, Georgia. MHC Texas is a citizen of Delaware by incorporation and a citizen of Georgia by the local of its principal place of business via the "nerve center" test.  MHC Texas is not a citizen of the State of Texas.

32.     MHC Holding Company ("MHC Holding") is a Delaware limited liability company with its principle place of business at One Ravinia Drive, Suite 1500, Atlanta, Georgia.  By operation of law, MHC Holding has designated the Texas Secretary of State as its agent for service of process.  Accordingly, MHC Holding may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin,

Texas 78711-2079. The Texas Secretary of State may then forward the process documents on to MHC Holding at MHC Holding's Headquarters at One Ravinia Drive, Suite 1500, Atlanta, Georgia 30346-2115. Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means. All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met. Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve MHC Holding pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to MHC Holding at its home office, to wit: MHC Holding's Headquarters, One Ravinia Drive, Suite 1500, Atlanta, Georgia. MHC Holding is a citizen of Delaware by incorporation and a citizen of Georgia by the local of its principal place of business via the "nerve center" test. MHC Holding is not a citizen of the State of Texas.

33. National Senior Care, Inc. ("National") is a Delaware limited liability company with its principle place of business at One Ravinia Drive, Suite 1500, Atlanta, Georgia. By operation of law, National has designated the Texas Secretary of State as its agent for service of process. Accordingly, National may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079. The Texas Secretary of State may then forward the process documents on to National at National's Headquarters at One Ravinia Drive, Suite 1500, Atlanta, Georgia 30346-2115. Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means. All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met. Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve National

pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to National at its home office, to wit:  National's Headquarters, One Ravinia Drive, Suite 1500, Atlanta, Georgia.  National is a citizen of Delaware by incorporation and a citizen of Georgia by the local of its principal place of business via the "nerve center" test. National is not a citizen of the State of Texas.

34.     Mariner Health Care, Inc. ("Mariner Inc.") is a Delaware limited liability company with its principle place of business at One Ravinia Drive, Suite 1500, Atlanta, Georgia.  By operation of law, Mariner Inc. has designated the Texas Secretary of State as its agent for service of process.  Accordingly, Mariner Inc. may be served with process by serving the Secretary of State of the State of Texas at Statutory Documents, Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079.  The Texas Secretary of State may then forward the process documents on to Mariner Inc. at Mariner Inc.'s Headquarters at One Ravinia Drive, Suite 1500, Atlanta, Georgia 30346-2115.  Such service of process is authorized pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042, 17.044, 17.045 and 17.026 and other lawful means.  All conditions precedent to invoking this form of service pursuant to these statutory provisions have occurred or been met. Upon receipt of such process, the Secretary of State of the State of Texas is hereby requested to serve Mariner Inc. pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045 (a) (Vernon 1996) and other lawful means by immediately mailing by registered or certified mail, return receipt requested the summons and complaint to Mariner Inc. at its home office, to wit:  Mariner Inc.'s Headquarters, One Ravinia Drive, Suite 1500, Atlanta, Georgia.  Mariner Inc. is a citizen of Delaware by incorporation and a citizen of Georgia by the local of its principal place of business via the "nerve center" test.  Mariner Inc. is not a citizen of the State of Texas.

21

35.     To the extent any new party is in fact a Texas citizen, Plaintiffs reserve their right to seek further amendment removing such entities from the litigation so as preserve diversity jurisdiction.  The adding of these new entities is not for delay or to destroy diversity jurisdiction, but that justice may be done.

## IV.  FACTS

36.     Decedent Betty Battle ("Battle") resided in a nursing facility known as Mariner Health of Southwest Houston from approximately April 2004 until she died on August 18, 2004.  During this time, she spent a brief time at another facility for wound care and returned to the Mariner facility before she died.

37.     On April 6, 2008, Gladys Robins brought suit in the District Court of Harris County, Texas, individually on and on behalf of the Estate of Betty Battle, Deceased, Robert Charles Robin, Sandra Jean McGowan, Lucille Marie Brown, and Dexter Leon Battle (collectively "Plaintiffs").  Plaintiffs asserted wrongful death and survival claims against Mariner Health Care of Nashville, Inc. and Mariner Health of Southwest Houston ("Mariner Nashville" and Mariner Southwest").

38.     Mariner Nashville, a defendant in the Harris county case, was formed as a Delaware corporation, incorporated in 1995.  Mariner Nashville owned and operated Mariner Houston, a nursing facility located at 8820 Town Park Drive, Houston, Texas 77036.  Ms. Battle resided at this facility for several months during 2004 and Mariner Nashville owned and operated Mariner Houston during the time period Battle resided there.

39.     In 2006, Plaintiff also sued SSC Houston Southwest Operating Company LP ("SSC Houston"), which was listed as the operator of the nursing home where Ms. Battle had died.  In October 2006, however, after the underlying negligence case was filed, counsel for SSC Houston told Plaintiff that SSC Houston was "not a proper defendant in this action" because "[a]lthough SSC Houston currently operates the Facility, it did not begin to do so until April 1, 2005 . . . which is approximately eight months after the residence at issue in this case ended[.]  . . . Moreover, SSC Houston specifically did not assume any liability from the prior operator for

23

claims arising from alleged injuries prior to the Facility Transfer Date." In reliance on SSC Houston's counsel's representations, and unaware at that time of facts that would become apparent only after SSC Houston's operators became involved in litigation in New York and Delaware involving Schron and Schron Entities, Plaintiff agreed to dismiss SSC Houston from the negligence suit. *See* Exhibit 2 (Troutman Sanders LLP letter dated October 2, 2006).

40.    Plaintiffs' case against the Mariner Southwest and Mariner Nashville was tried to a jury from April 23, 2008 to April 30, 2008.  The Harris County District Court signed a judgment in Plaintiffs' favor and against Mariner Nashville d/b/a Mariner Houston on July 11, 2008, Cause No 2006-51469; *Gladys Robins, Individually and on Behalf of the Estate of Betty Battle, Deceased, and All Wrongful Death and Survival Action Beneficiaries; Robert Charles Robin; Sandra Jean McGowan; Lucille Marie Brown; and Dexter Leon Battle vs. Mariner Health of Southwest Houston; SSC Houston Southwest Operating Company LP; Mariner Health Care of Nashville, Inc.; and Mariner;* in the 61st Judicial District Court of Harris County, Texas.  The verdict awarded to plaintiff was $750,000, but the judgment awarded to Plaintiffs was reduced to $250,000 in actual damages (under the Texas tort reform caps statute) plus $2,175.96 in taxable court costs and post judgment interest at the rate of 5% compounded annually.  Wrongful death claims were asserted, but the Battle Judgment was based on a finding of liability under the survival action, not wrongful death action.

41.    Mariner sought unsuccessfully to have the judgment set aside on appeal.  On July 1, 2010, the judgment was affirmed by the appellate court.  Mariner Health Care of Nashville, Inc. v. Robins, 321 S.W.3d 193 (Tex. App. - Houston [1[st] Dist.] 2010).  The Battle Judgment became final on or about August 1, 2010.  The defendants in the Battle personal injury case did not pursue any further appeal.

42.      In an affidavit that Mariner Nashville posted in the personal injury case in October
2008—in an effort to avoid the requirement for posting of an appeal bond after entry of judgment
against it—Boyd Gentry, a former "officer" of Mariner Nashville (and the one-time president of
Mariner (after it become an operations-only subsidiary of yet another holding company), testified
that "Mariner Nashville does not have the financial resources to pay the amount of the
$252,175.96 judgment, plus interest, and/or pay for a bond protecting the full amount of the
judgment.   Mariner Nashville no longer operates or has any source of income.   Mariner
Nashville does not have the resources to cover the entire amount or even 50% of the $252,175.96
judgment, plus post-judgment interest.   The combined total of Mariner Nashville's assets is
substantially less than the amount of the judgment."   In fact, a document attached to Mr.
Gentry's affidavit indicates that Mariner Nashville has almost no assets whatsoever.

43.      In Mr. Gentry's affidavit, he further indicates that "[i]n December 2004, National Senior
Care, Inc. acquired Mariner Nashville.   Shortly after the acquisition, on April 1, 2005, Mariner
Nashville ceased operating Mariner Houston.   SSC Houston Southwest Operating Company LP
("SSC Houston") began to operate the healthcare facility where Battle previously resided,
changing the name to Westchase Health & Rehabilitation Center.   Mariner Nashville in fact
ceased operating all facilities as of December 2005, before this lawsuit was filed."

44.      Upon information and belief, SSC Houston is or was a wholly owned subsidiary of Sava
Senior Care, which, as further discussed herein, is the operating company created during
National Senior Care, Inc.'s leveraged buyout of the former Mariner Health Care Inc., including
its most valuable assets—its real estate—which as shown herein was immediately purchased for
less than fair market value by Schron and Schron Entities.   Sava was created to operate nursing
facilities that would be required to lease buildings the new operators only briefly owned from

other entities Schron created to become landlords to the various Sava operating entities.  In this way, Schron sought to separate and protect the value of the real estate from creditors of the operators.  The valuable assets acquired by Schron and Schron Entities through the Mariner LBO included the real property at which Mariner Health of Southwest Houston had operated in 2004, and from which SSC Houston d/b/a Westchase Health & Rehabilitation Center commenced operations after the LBO in 2005.

45.     Upon information and belief, the valuable assets of the Mariner Defendants in the negligence lawsuit, including real property in Houston that in July 2004 appraised for $4,970,000, were deliberately and purposefully depleted through a series of complex and concocted corporate transactions related to a leveraged buyout commencing in 2004.  Upon information and belief, the intended effects of Mariner's complex and confusing restructuring have carried into the present, and were engineered by Schron, and involved the Schron Entities and the other named defendants here, with the intent and the effect to enrich Schron and the Schron Entities he controlled and controls through acquisition of Mariner's most valuable asset, its nursing facility real properties, while depriving existing and future creditors of the continuously operation nursing facilities, including Plaintiffs here, of an effective right and ability to recover damages for injuries suffered while residents of nursing homes operating once as Mariner and now, effectively, under Schron's ownership or control.  Upon information and belief, through the Mariner LBO and post-LBO activities, Schron and Schron Entities sequestered the value of Mariner, which was fraudulent obtained, apparently causing operators even to grant secret purchase options to Schron or Schron Entities for substantially less than fair market value, all to the prejudice and detriment of legitimate creditors, including Plaintiffs here.

**Schron's Leveraged Buyout Scheme**

46.     Called "leveraged buyouts" in the 1980s and recast as "private equity buyouts" after LBOs were heavily criticized, LBOs use money invested by limited partners—typically wealthy individuals or public pension funds—to purchase an established company.  These deals often entail significant levels of debt; the private equity firm contributes some equity and uses the assets of the target company as collateral for the majority of the purchase price.  In order to ensure a profitable exit later, the buyout firm may pursue a number of operational strategies to raise revenues and limit costs.  The buyout firm itself typically makes money in two ways: through fees, including lease payments, and transaction and management fees during the life of the investment, and through their cut of the profits realized at sale, often 20 percent or more.

47.     Private equity buyout firms operate virtually free of oversight and public accountability, their profits and practices largely hidden from view.  Far from a coincidence, this lack of transparency is built into their business model, providing buyout firms with certain advantages that publicly traded companies do not enjoy.  For example, private equity-owned companies do not have to:  (1) disclose to the public their debt levels, or other aspects of their capital structure; (2) report executive compensation; (3) report events that have a material impact on their business, whether positive or negative; or (4) report acquisitions or divestitures.  Private equity buyout firms operate behind a veil of secrecy that allows them to conceal virtually all aspects of their business from regulators, affected stakeholders, the general public, and their competitors.

48.     One of the defining characteristics of private equity buyouts of nursing homes is the lack of disclosure about how firms intend to reorganize and operate the company after it has been purchased.  For almost two decades, the nursing home industry has trended toward separating the real estate and the operations components of nursing homes as a way to avoid liability for

27

personal injury claims, even though the artificial transactions were themselves expensive and had no apparent positive impact on the quality of care provided to facility residents.

49.     In fact, an article written by nursing home attorneys and published in the Fall 2003 *Journal of Health Law* encouraged nursing home operators to engage in complex corporate restructurings precisely to avoid, or at least to minimize, financial liability:

> "Dividing the nursing home business into real estate investment and real estate operations will reduce the nursing home company's exposure to risks associated with owning and operating one or more nursing homes. The degree to which this reduction of risk can be maximized will be a function of how elaborate a corporate structure the particular company is willing to create. The ultimate structure would consist of forming a real property SPE [single-purpose entity] to hold each piece of real estate, as well as a separate operating SPE for each nursing home business."

*See* Casson J., McMillan, J., Protecting nursing home companies:  Limiting liability through corporate restructuring, *Journal of Health Law*, Fall 2003; 36(4):  577-613).

50.     A study prepared two years later by Harvard Medical School experts for the U.S. Department of Health and Human Services, detailed the impacts of the restructurings and noted: "Integrated Health Services, Mariner Health Care, and, most recently, Beverly, are examples where equity groups purchased chains with the intention of separating the real estate and operations with the goals of limiting liability and enhancing profitability."   *See* http://aspe.hhs.gov/daltcp/reports/2006/NHdivest.htm.

51.     And, investigators with *The New York Times* confirmed on September 23, 2007 that increasing ownership obscurity, which health care transactions attorneys were counseling for in 2004, was by 2007 working as intended.  *The New York Times* concluded:

> Private investment companies have made it very difficult for plaintiffs to succeed in court and for regulators to levy chainwide fines by creating complex corporate structures that obscure who controls their nursing homes . . . The Byzantine structures established at homes owned by private investment firms also make it harder for regulators to know if one company is responsible for multiple centers. And the structures help managers

28

bypass rules that require them to report when they, in effect, pay themselves from programs like Medicare and Medicaid.

*See* Duhigg, C., At Many Homes, More Profit and Less Nursing. *New York Times*, September 23, 2007; A1.

52.   Until December 10, 2004, Mariner was a publicly traded Delaware corporation that owned and operated healthcare facilities, including nursing facilities.  Mariner was subject to federal securities laws and regulations as well as to daily scrutiny by financial analysts and the business media.  In December 2004, however, through a private equity buyout that Schron pursued with others who he would allow to manage the allegedly independent nursing home operating companies that were also created when Mariner's assets were ostensibly divided.  Through the Mariner LBO, National Senior Care ("NSC") first acquired Mariner's 29,685 nursing home beds in 252 facilities across 19 states and quickly sold many of its facilities (the nursing facility real properties Mariner had owned) to another company called SMV Property Holdings.   Schron created SMV Property Holdings to hold his newly acquired Mariner properties.  SMV Property Holdings remains owned and controlled by Schron.

53.   SMV Property Holdings planned to and did in fact set up separate real estate holding companies for each of the properties purchased, including the nursing facility operated as Mariner Health of Southwest Houston, and then leased these same facilities back to Mariner (now a wholly owned subsidiary of National Senior Care functioning as an operator but no longer an owner of nursing facilities) or SavaSenior Care, another affiliate of National Senior Care that was created (like the "new" Mariner) to operate some of the nursing homes, while owning no properties itself.  In each case, Mariner's and Sava's, the operators would own none of the valuable real estate.  The property that had obvious value to judgment now would appear

29

to have been purchased for fair market value by a landlord operating independently of either Mariner, or Sava.  Adding to the structural complexity, at least some former Mariner homes were identified as being run by subsidiary operating companies that were unique to each nursing facility location and which apparently (as Mr. Gentry described) had no real operations or assets should judgments be obtained.  This layering made it even more difficult for judgment creditors to one day find any valuable assets upon which to collect their valid judgments.

54.     According to attorneys with the former Powell Goldstein law firm involved in the private equity buyout of Mariner, when Mariner agreed to be acquired by National Senior Care, Inc. ("NSC"), in spring 2004, "it set in motion a billion-dollar transaction that may well serve as a case study in complexity. . . . the deal took nearly seven months to complete; involved roughly 80 attorneys from a half-dozen law firms; and hinged on the sale and lease-back of Mariner's most valuable assets—its skilled nursing facilities."

*See* http://www.martindale.com/pdf/c2c/magazine/2005_Mar/c2cMag_Mar05_PGPIP.pdf

55.     Rick Miller, then with the Powell Goldstein law firm that functioned as Mariner's outside counsel at the time, described the buyout as "the single most complex deal I've ever done.  We literally had an army of lawyers working on this for almost nine months.  There were 30 Powell Goldstein attorneys alone, and close to 50 more representing all the other parties."  According to former Powell Goldstein attorneys, the Mariner buyout involved selling 170 of Mariner's 260 skilled nursing facilities to a third party—SMV, a real estate investment company—to help National Senior Care finance the merger.  Under terms of the proposed agreement, SMV would lease the properties back to either Mariner (which by then would be an NSC subsidiary), or to another company, Sava SeniorCare.  (According to the Master Purchase Agreement, Schron, through SMV, actually purchased 168 facilities from Mariner, not 170.)

30

56.     Proxy materials published in anticipation of the Mariner LBO explained one of the risks of the proposed merger.  Specifically, the Proxy Statement provided:  "As a result of the merger or certain transactions which are expected to occur subsequent to the consummation of the merger, Mariner's stockholders may face the risk that the merger consideration, to be received by them in connection with the merger, could be characterized as a fraudulent conveyance if a bankruptcy or reorganization case is filed by or on behalf of unpaid creditors of Mariner and it is subsequently determined that the merger or such subsequent transactions has the effect of rendering Mariner insolvent."  In short, the participants in the Mariner LBO were warned of the need to ensure that the transaction involved arm's length negotiations and fair market value consideration.

57.     In an effort to protect themselves from the scrutiny and criticism of the public, regulators, bankers, creditors and consumers—constituents that might challenge Schron's effort to purchase Mariner's "most valuable assets" while leaving its most critical operations to others with far fewer resources, bankers were hired to provide their "independent" opinion on the solvency status of the operating entities that would remain.  The opinion provided and attached to Mariner's 2004 proxy statement suggested that Mariner was in fact receiving fair market value from Schron and Schron Entities because (1) his company, SMV Holdings, would be paying $800 million for Mariner's most valuable assets, its owned skilled nursing facility (SNF) real estate portfolio," and because Schron or Schron Entities also would be infusing one or more of the remaining operating companies with considerable equity capital.

58.     As part of the transaction whereby Schron and Schron Entities were purchasing Mariner's nursing facility real estate portfolio, Schron committed to put additional equity into the entity that would be left to operate the facilities after operations were separated from the real estate

acquired by Schron as part of the Mariner LBO.  In an October 2004 letter signed by Schron on Cam Int'l letterhead, Schron committed to providing not just $200 million in equity capital that he had initially promised to provide in June of 2004 to ensure that the "new" operating company's assets were sufficient to meet its ongoing and future financial obligations, but an additional $100 million in equity capital.  *See* Exhibit 3 (Schron/Cam Int'l letter dated October 4, 2004).  (Equity capital is invested money that, in contrast to debt capital, is not repaid to the investors in the normal course of business.  In short, these funds from Schron were not supposed to be loaned money, although Schron seems to disagree as indicated in his suit against his operators.)

59.     Upon information and belief, Schron and Schron Entities failed to pay all of the promised equity capital he owed in return for participating in the LBO and acquiring Mariner's most valuable assets, the improved real properties Mariner had owned.

60.     Upon information and belief, Schron and Schron Entities also paid at least $200 million less than fair market value for Mariner's buildings and land.

61.     Thereafter, once Schron and Schron Entities became the landlords for the newly created nursing home operating companies, Schron and Schron Entities proceeded to further deplete Mariner's and Sava's operating assets by engineering and requiring exorbitant above-market rent payments and secret purchase/control options that were designed to perfect his control over supposedly independent operating companies.  Independent operators might have refused to make the payments Schron and Schron Entities insisted upon.  But, according to Schron—as set forth in his 2010 lawsuit filed against his tenant operators—the operators were not independent at all.  To the public, the landlord and tenant had appeared independent and thus insulated from each other's misconduct.  In reality, Schron has testified to facts indicating that he controlled

both the buildings and significant aspects of the nursing homes' operations.  The operators were controlled by individuals picked by Schron (he asserts they even owed him fiduciary duties) and with whom he agreed to shared profits Schron obtained from leasing his newly acquired facilities to the newly created operators.  Schron's complex restructuring of Mariner accomplished his purpose of greatly increasing his wealth while depleting the assets of the former nursing home operating company and its subsequent affiliates.  His complex structuring and secret dealings made it far more difficult for taxpayers, residents, and their survivors to hold the nursing homes accountable for the care they provided while ensuring that the profits from operations remained with him.  With less than fair market value acquisition payments and above fair market value lease payments, Schron and Schron Entities knew that creditors would be left at the curb.

**Schron's 2010 Litigation Against Business Partners**

62.    The shroud of secrecy that obscured the true facts and intentions of participants in Mariner's LBO was partially pulled back in 2010 when Schron and the business partners and associates involved with him in Mariner's LBO became embroiled in litigation, including lawsuits filed by and against Schron and Schron Entities in New York and Delaware.  The lawsuits involving Schron demonstrate that he intended to dump all value into real estate holding companies, to control Mariner's valuable real estate after its LBO, and even to control how Mariner's new operators, other newly created holding companies, could and would spend "their" revenues.  Contracts, secret agreements and overlapping ownerships secured for Schron and Schron Entities guarantees that he would make money even if creditors went unpaid.  Indeed, according to Schron's complaint, which he verified, the supposedly independent nursing home operators actually owed fiduciary duties to Schron, not to the operating companies he knew his associates ran.

63.      According to documents filed by Schron himself, including an affidavit sworn to by him on June 22, 2010, Schron is the sole manager for Cammeby's Equity Holdings LLC.  According to Schron, all of the other entities identified as plaintiffs in the New York lawsuit he brought against his former attorney and his former investment banker are entities "owned and controlled by me or members of my family."   Most of the other plaintiff entities in Schron's New York lawsuit are the very same entities now identified as Defendants in this case.

64.      In his New York lawsuit, by which Schron's conduct and intentions have become known, Schron testified in 2010 that in early 2004, "his attorney," Leonard Grunstein, and his investment banker, Murray Foreman, "proposed that I acquire nursing home properties owned by Mariner Health Care, Inc.  I expressed interest in a transaction where we could acquire the underlying real estate and receive a steady and favorable rental payment from the nursing home operator.  [The attorney and the banker] proposed a separation between the property company and the operating company.  We would create a company to own the real estate (SMV), and receive rental payments under a master lease from the nursing home facilities, and SAVA, the operating company, would be a tenant, operate the nursing homes, and be in the healthcare services business."

65.      In the 2010 NY lawsuit Schron filed against the attorney and the banker (and against many of the operating companies, including Mariner and Sava), Schron testified (in paragraph 103 of his Amended Verified Complaint) that the lawyer and banker "persuaded Schron to participate in the Mariner deal [and that] the transaction could be structured so as to protect Schron's ownership of the underlying real estate assets, among other things, from any interest rate movements adversely affecting the anticipated floating rate financing and from any default by the nursing-home tenant operator.  [The lawyer and banker] also promised Schron he would

34

have an option to acquire the operating company if that ultimately turned out to be valuable."

Thus, according to Schron, he acquired not just the nursing home properties, but a secret (and

undisclosed in any of the proxy materials) exercisable right to ownership of the operations, too.

According to Schron, his secret options involve acquisition of all of Sava and two thirds of the

"new" Mariner.  *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶¶110, 131).

66.     In an affidavit Schron supplied as part of his lawsuit against his operators, Schron

testified that he "agreed to the proposed acquisition, and provided capitalization and financing

required to complete the deal."   At the same time, Schron said he "was not interested in

operating the nursing homes, but he was in interested in a transaction whereby he could acquire

the underlying real estate and receive a steady rental payment from the nursing home operator."

Of course, his lawsuit belies this testimony.  *See* Exhibit 4 (Schron's Affidavit at ¶13; Exhibit 5

(Schron's Memorandum of Law in Support of Request for Order to Show Cause for Preliminary

Injunction with Temporary Restraining Order at p.5).

67.     But, according to Schron, "the intention behind Sava's creation was to operate and

service the facilities and ensure the timely payment of rent to SMV; it was not to create

unlimited upside for operators who, in addition to receiving a large promotional interest [in

SMV], were handed the operations of the facilities for nothing."   *See* Exhibit 1 (Schron's

Amended Verified Complaint, ¶109).  Thus, according to Schron, his "deal" was really supposed

to have required that profits from operations net of rents also be paid or shared with Schron—not

controlled by the ostensible independent owners of the operating entities.  Schron was not, he

says, just a landlord.  He was the puppet master of the post-LBO operations, too.

68.     Although to the public it appeared that Schron was only to be the landlord for the post-

LBO operators of Mariner's nursing homes, testimony Schron provided in 2010 further destroys

that illusion.  Instead, Schron says he now controls and should have controlled nursing home operations, too, because the individuals supposedly involved in the "independent" operations side owed fiduciary duties to Schron and were bound by secret side agreements with Schron.  He testified that "[s]olely as a promotional fee for the Mariner Transaction, [the lawyer and the banker] received a 13.5% ownership interest in SMV [and his lawyer] also persuaded me to allow his brother . . . to own and operate SVCARE."  According to Schron, "In persuading me to accept this structure, [my lawyer] told me that I would have an easily exercisable option to acquire SVCARE [the operating company for numerous nursing facilities Schron purchased] if I later decided it was in my interest to do so."  *See* Exhibit 4 (Schron's Affidavit at ¶14).  (According to Schron's lawsuit, "SVCARE is a holding company that directly owns through Sava and, through Sava, holds numerous nursing home operating entities.")  *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶48).

69.     Schron testified in his New York lawsuit that his attorney and the investment banker told him that "the SVCARE option would provide me and the Schron Entities with security in return for the equity capitalization and financing of the Mariner Transaction."  In other words, Schron was not really providing unsecured equity capital at all—the capital he supposedly provided was "secretly" secured by options to acquire the assets of the operators.  According to Schron, "[I]n return for capitalizing and financing the Mariner Transaction, I would have the ability to easily acquire SVCARE if I thought doing so was in my best interests or in the best interests of the Schron Entities."  *See* Exhibit 4 (Schron's Affidavit at ¶17).

70.     In addition to the security of the secret options, according to Schron, a lease was designed by him and the master operator of the nursing facilities "to ensure that rent always exceeded debt service related to the real estate.  Specifically, SMV's senior mortgage contained a floating

interest rate rather than a fixed rate.  [S]uch a financing could endanger Schron's investment in

the event that interest rates rose.  To eliminate this possibility, [Schron's attorney and his banker]

advised Schron that they would structure the lease with SAVA so that, in the event his financing

costs rose, the lease between Sava and SMV would require the leasehold rent to increase in an

amount equal to the financing costs.  Similarly, if the operations proved profitable over time, the

deal documents granted a Schron Entity the option to acquire Sava at an effective price of $100

million."

71.     The exact amount of rent that the Mariner homes paid to these related parties is not

publicly available, but published reports of reviews of other public records indicate that the

building and fixture-related capital costs that Mariner reported on its Medicare cost reports rose

by 60 percent the year after National Senior Care took over and became the holding company for

Schron's "new" tenants, while in the previous three years it had increased by a total of only 11

percent.   In addition, interest expense payments, an indicator of how much debt has been

incurred, increased by 145 percent from 2004 to 2005, the year after the buyout.  At the same

time, the number of Mariner facilities that reported any interest expenses in 2005 was more than

four times the number that had reported interest expenses in any of the previous three years.

72.     In Schron's lawsuit against his attorneys, he even complained that operators violated

fiduciary duties owed to him and Schron Entities "as a purchaser, borrower, landlord and lender"

by seeking to prohibit him from raising operators' rent even more and keeping money from

leases that were, Schron alleges, intended to ensure that operating revenues went to him and the

Schron Entities under lease arrangements that were intended to be "zero-sum."  *See* Exhibit 1

(Schron's Amended Verified Complaint, ¶¶124, 135).

73.     According to Schron, he paid for the entire business, guaranteed the financing, and assumed all of the risk, and as a result, Schron and related parties not only secured leases that insulated them from risk, but also received options to buy the nursing home operating companies (all of Sava and 2/3 of Mariner) if Schron later chose to do so—presumably after creditors like Plaintiffs gave up on collecting operators' debts.  *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶¶131, 132, 139, 140).  According to Schron, even the equity of the nursing home operations should belong to him.  *See* Exhibit 1 (Schron's Amended Verified Complaint, ¶143; Exhibit 4 (Schron's Affidavit at ¶¶30-32).

74.     Nowhere in the proxy statement materials that Mariner filed in October 2004, before the December 2004 LBO that Schron says he led occurred, was the Option that Schron supposedly obtained to acquire Sava in exchange for loaning $100 million mentioned (or 2/3 of Mariner for who knows what).  Nor was an option mentioned in the investment bankers' fairness opinion.

75.     Instead, documents filed in the proxy materials indicate that Schron was to provide hundreds of millions of dollars as equity infusions not in exchange for secret options to acquire everything that remained after the real properties were transferred to Schron and Schron Entities, but as a requirement to ensure that after Mariner's nursing home properties were separated from its operations (as health care transactions attorneys were suggesting should occur in an effort to remove and preserve the profitable assets from creditors), the operations remained solvent.  The solvency opinion provided by Houlihan, Lokey, Howard & Zukin Financial Advisors, Inc. was conditioned on the following understanding of the Mariner LBO:  "It is our understanding that the Purchaser [National Senior Care, Inc.] is presently contemplating funding the Purchase Price with the proceeds received from the sale of the Company's owned skilled nursing facility ("SNF") real estate portfolio for $800 million to SMV Property Holdings LLC (the "Real Estate

Transaction") along with a $150 million asset based loan (the "Secured Loan"), a $75 million equity capital commitment from NSC and approximately $20 million of the Company's cash on hand.  In addition, there will be a revolving line of credit facility (the "Cammeby's Line of Credit") provided by Cammeby's Funding LLC presently contemplated to be available to fund the liquidity needs of the Company, if any."

76.    A forensic accountant employed to determine whether Schron or Schron Entities ever did in fact satisfy the financial commitments that they had promised as part of Mariner's LBO, including the commitments set forth in the October 4, 2004 letter committing Schron to pay $300 million in equity, concluded that Schron *failed to pay at least $100 million* of the equity capital that he promised to pay and which was owed to the post-LBO operating entity.  *See* Exhibit 6 (Report of Roger D. Siefert, C.P.A., filed in Schron's New York civil action (Index. No. 650702/10) against Grunstein, Forman *et al*.).

77.    According to the forensic accountant:  "In connection with the December 10, 2004 merger and acquisition transaction of Mariner Health Care, Inc. ("MHC") discussed more fully below, Cammeby's Funding III LLC ("Cammeby's III") committed to loan to SVCare Holdings, LLC ("SVCare") $100 million, which funds would then be injected as equity by SVCare into its wholly-owned subsidiary SavaSeniorCare LLC ("SSC") as required by certain loan agreements."

78.    According to the forensic accountant:  "[A]t no time did Cammeby's III or any of the other Plaintiffs ever advance $100 million in funds to SVCare that could be used to make a $100 million contribution of equity to SSC [and] at no time did any of the Plaintiffs ever advance any funds to SVCare, SSC or others sufficient to meet the commitments made by Mr. Rubin Schron in his Equity Commitment Letter to Mariner Health Care, Inc. dated October 4, 2004 (the "2004 Equity Commitment Letter").

79.     The forensic accountant concluded that the sources of funds available at the closing of the merger and acquisition transaction on December 10, 2004 were inadequate to provide SVCare or SSC with the $100 million of promised equity capital.  Moreover, the funds invested by Schron and Schron Entities in connection with the same closing were significantly less than the amounts to which they had committed.  The forensic accountant determined that any documentation prepared in connection with the closing of the merger and acquisition transaction that shows the $100 million as being funded is incorrect.

80.     Remarkably, in the affidavit Schron filed in his New York lawsuit against his attorney and an investment banker, Schron does not seek to prove that he paid the promised equity to the operators post-LBO.  Rather, he indicates that if $100 million was, in fact, required to be provided as consideration for an option he secured as part of Mariner's LBO, and if he never provided it, no one informed him "prior to 2010,  that a company of mine had pledged to make a $100 loan, but had never made the loan."  *See* Exhibit 4 (Schron's Affidavit at ¶24).

81.     Not only did Schron pull Mariner's strings after December 2004 (and before his 2010 lawsuit) through secret agreements and fiduciary obligations that he said ran to him, the $800 million that Schron allegedly paid for Mariner's real property assets appears to have been far less than these asserts were worth, depleting from inception the funds available to the new operators—to the detriment of creditors and residents.  When Mariner's LBO did occur in December 2004, Schron had contracted in a Master Purchase Agreement Dated as of December 9, 2004 to purchase the 168 nursing facilities previously owned by Mariner for $800 million, allocating the $800 million purchase cost among the 168 facilities on a document called Schedule 2.2 to the Master Purchase Agreement.  *See* Exhibit 7 (Master Purchase Agreement, Schedule 2.2).

40

But, according to a schedule prepared to support the financing contributed by Credit Suisse First Boston in support of the December 2004 LBO, which set forth set forth the appraised value of the mortgage properties that Schron would be acquiring from Mariner, the appraised value of the 168 Mariner facilities Schron "purchased" was $1,004,150,500 (after the value of the 26 IHS (non-Mariner) properties listed in the table, which were appraised as worth $194,435,000, were deducted from the $1,198,585,599 total figure for 194 properties).   Schron's $800 million for the Mariner facilities, even assuming all of it transferred as represented, amounted to a significant—approximately $200 million—"insider discount" for Mariner's most valuable assets, its real properties.  *See* Exhibit 8 (excerpts from Credit Suisse First Boston December 2004 Confidential Offering Circular).

## COUNT I
## Piercing the Corporate Veil —Alter Ego

82.     The above paragraphs are incorporated herein by reference as if set forth herein verbatim.

83.     Plaintiffs' claims arose before or within a reasonable time after the complained of transfers of the valuable real property assets of Mariner were made and unfulfilled obligations to fund the ongoing nursing home operating companies were incurred.  The corporate forms used to shield Defendants should be disregarded based on one or more "veil piercing" doctrines. Mariner Health Care of Nashville, Inc. and Mariner Health of Southwest Houston ("Mariner"), which became SSC Houston Southwest Operating Company LP ("SSC Houston"), operated after the Mariner LBO by Sava, were mere alter egos of their ultimate parent, Sava.  Schron claims to control Sava (by way of an exercised secret option) and did control Sava after the Mariner LBO given the fiduciary obligations owed to him by Sava's management, the conflicted financial payments he funneled to them as co-owners of one of the real property holding companies, and the alleged option he held from them to purchase Sava at a fire-sale price (for no more than the equity he had to put in to acquire the real estate).   To the world, attorneys built complex

41

relationships that made it appear that landlords and tenants were independent entities, that Schron and the Schron Entities (his real estate holding companies) were independent of the operators.  In reality, the corporations identified as technically operating in Texas, both the operating corporations and the real estate holding corporations, were used as a sham to perpetuate a fraud on creditors, including Plaintiffs, and used as piggy banks that were completely controlled and dominated by Schron and Schron controlled entities, functioning solely to enable Schron to achieve his fraudulent purposes, namely to drain hard assets and liquidity out of nursing home operations, leaving behind corporate carcasses that would appear worthless to creditors seeking to enforce obligations.  In order to do equity and prevent injustice, this Court should disregard the corporate fiction and treat the assets of Schron and Schron controlled entities as "one and the same," just the way Schron and Schron controlled entities treated the assets.

84.     Schron and the entities he controlled used his entities as mere conduits, nominees and/or as agents to secret assets and otherwise implement the fraudulent transfers complained of in this suit.  While recognition of a corporation as an entity separate and distinct from the members who compose it is common, it is a legal fiction and not a sacrosanct principle to be inevitably followed when the fiction is opposed to the facts.  Here, it is necessary to disregard the fiction to cope with Schron's abuses of the corporate method of conducting business.  The larger principles of justice must not be obscured by the corporate veil.  A fiction should not prevail over fact.  The Court should look through the mere corporate form of things to the reality, and hold that the supposedly distinct operating companies were merely shells existing for and on behalf of Schron and his entities as a means to frustrate creditors while secretly depleting operating revenues in order to lodge almost all value, after the Mariner LBO, in the real property holding companies.

Adherence to the corporate fiction, under the facts of this case, would sanction a fraud of epic proportions.

85.     The corporate forms of all defendant entities should be disregarded because:  (1) the corporate form was used as a sham to perpetuate a fraud; (2) the defendant entities were operated as a mere tool or business conduit of Schron; (3) the corporate form was used to justify a wrong, circumvent one or more statutes and evade one or more legal obligations; (4) the businesses were intended to operate and did operate as a single, almost "zero sum" business enterprise; (5) Schron caused the defendant entities to be used for the purpose of perpetuating an actual fraud; and (6) Schron perpetuated an actual fraud on creditors, including Plaintiffs, primarily for his benefit, as well as for the benefit of his associates and agents.

86.     The facts of this case should likewise warrant the disregarding of the corporate veils of the defendant entities on the basis of the single business enterprise doctrine and instrumentality rule due to the fact that the subsidiary parents had no truly separate and independent corporate existence of their own, functioning instead to achieve the fraudulent purposes of the controlling individual, Schron.  According to Schron, the operating companies were ostensibly controlled by individuals owing fiduciary and undisclosed contractual duties to Schron, operating without a separate mind, will, or reason for existence on their own except to shield and secret assets with, as the facts here show, so far much success.

## COUNT II
## Fraudulent Conveyances

87.     The above paragraphs are incorporated herein by reference as if set forth herein verbatim.

88.     The transfer of Mariner's real properties to Schron and Schron Entities, and the obligations thereafter incurred by the operating companies, exhibit all of the classic badges of fraud" outlined in the Texas Uniform Fraudulent transfer Act:

A.     "[T]he transfer or obligation was to an insider."  Tex. Bus. & Com. Code Ann. § 24.005(b)(1).  The sale of Mariner's assets and operations was a leveraged buyout that Schron says was led by his agents and for his benefit—to acquire the valuable real estate, risk free, while purporting not to own or control the operating companies until such time as he might choose to exercise secret options he possessed.  According to Schron himself, the leveraged buyout was not intended and did not occur as an arm's length transaction between independent individuals controlling independent companies.

B.     "[T]he transfer or obligation was concealed."  Tex. Bus. & Com. Code Ann. § 24.005(b)(3).   Before Schron sued his business partners, supposedly for breaching fiduciary obligations owed to Schron, including by challenging his effort to deplete the assets of operations by moving additional revenue to the entities functioning as landlords, Schron's control over operations was concealed by layers of corporate shells created to operate without any obligation to disclose how assets were being manipulated and removed.

C.     "[B]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened suit."  Tex. Bus. & Com. Code Ann. § 24.005(b)(4).

D.     "[T]he transfer was of substantially all the debtor's assets."  Tex. Bus. & Com. Code Ann. § 24.005(b)(5).

E.   "[T]he debtor removed or concealed assets."   Tex. Bus. & Com. Code Ann. § 24.005(b)(7).

F.   "[T]he value of the consideration received by the debtor was [not] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." Tex. Bus. & Com. Code Ann. § 24.005(b)(8).

G.   "[T]he debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred." Tex. Bus. & Com. Code Ann. § 24.005(b)(9).

H.   "[T]he transfer occurred shortly before or shortly after a substantial debt was incurred." Tex. Bus. & Com. Code Ann. § 24.005(b)(10).

89.   Schron and the associates he has identified in his lawsuit against them appeared to create an independent company to hold the real estate (SMV), and to receive rent.  But as Schron's suit against the operators makes clear, Schron intended (as did they, he says) that his rent would include almost all of the net cash flow generated by the operating company for the nursing homes involved in the Mariner LBO.  The associates were to profit from the share of SMV Schron provided to them, not from retaining revenue from nursing home operations.  Schron's testimony indicates that outwardly he pursued a restructuring to separate nursing home properties from their operations because he was to become an independent landlord.  Secretly, he now says, he also owned not just an option whereby he exercised functional control over nursing home operations, but also the ability (apparently until he had to sue the operators) to manufacture rents at all times to ensure that he profited from his acquisition of Mariner's real estate assets and from operations, too.  Each month rent is paid, Defendants fraudulently transfer assets which but for the re-organization scheme would cause profits to be available to post a bond while the underlying case was on appeal.  In addition, such profits could be used to satisfy the judgment

45

obtained by Plaintiffs.  Defendants have not only set a system of ongoing fraudulent transfers, but Defendants have defrauded the state court judge by falsely representing to the court that it lacked assets to post a bond or satisfy the judgment when in fact such was not the case.  Such action constituted a common law fraud against Plaintiffs in addition to fraud being committed in violation of the fraudulent transfer act.  **Plaintiff Glady Robins' Motion for Reconsideration** is incorporated herein by reference.

## COUNT III
### Conspiracy

90.     The above paragraphs are incorporated herein by reference as if set forth herein verbatim.

91.     An unlawful civil conspiracy arises in Texas involving (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as the proximate result.  *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983).  As alleged above, in December 2004, Schron, Schron Entities, and the operating companies identified herein agreed, and knowingly and willfully conspired between themselves to hinder, delay and defraud creditors, including Plaintiff in the collection of damages, and to remove almost all of the valuable property of Mariner into newly created entities owned and controlled by Schron and Schron Entities while knowing that they would render the post-LBO entities unable to pay any and all damages that nursing home operations owed and would owe to Plaintiff and other present and future creditors.

92.     Pursuant to this conspiracy, the above-named Defendants agreed that Schron would take ownership and/or possession of most of Defendant Mariner's valuable assets, including the above-described real property, and further cause Mariner's future operating entity to be depleted of revenues through inflated lease payments to Schron and Schron controlled entities and

unfunded capital obligations Schron or Schron Entities owed.  In furtherance of this conspiracy, Boyd Gentry testified under oath that Mariner Nashville lacked sufficient resources to pay the Battle Judgment when in fact there were sufficient resources via Schron to properly pay the judgment.  Schron is now estopped from asserting the corporate structure to avoid payment of the Battle Judgment since he has improperly used the corporate structure to perpetuate a fraud including by not limited to trying to avoid properly paying the Battle Judgment.

93.      Further, the Defendants conspired and agreed to hide any and all future assets acquired by Schron in sham corporations in order to frustrate creditors and thereby to protect Mariner's assets, which Schron and Schron Entities would now control, from collection.  Plaintiff is unaware of the present value of those assets which have been so hidden, but is informed and believes and thereon alleges that their value exceeds $250,000, the minimum value of Plaintiff's claim.

94.      Defendants did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and agreement alleged above, including the transfer of ownership of the nursing facility property previously known as Mariner of Southwest Houston, located at 8820 Town Park Drive, Houston, Texas, effectively depleting the assets of Mariner Southwest Houston, and its former owners/operators, while concealing those same assets in a newly created "landlord" holding company that would appear to be uninvolved in any past or future nursing facility operations and nothing more than another creditor, for rent, and therefore insulated by law from the legitimate creditors of nursing facility operations.

95.      As a proximate result of the wrongful acts herein alleged, Plaintiff has been generally damaged in the sum in excess of $250,000.

96.     At all times mentioned herein, Defendants knew of Schron's actions and intended actions against Plaintiffs and other present and future creditors and knew that Plaintiffs' claims could readily be satisfied only out of the property and operating revenues transferred to Schron during Mariner's LBO.     Notwithstanding this knowledge, Defendants intentionally, willfully, fraudulently and maliciously did the things herein alleged to defraud and oppress Plaintiffs.

97.     Plaintiffs are therefore entitled to exemplary or punitive damages in the sum of not less than $3,000,000 against all Defendants, individually and severally.

**COUNT IV**
**Common Law Fraud**

98.     The above paragraphs are incorporated herein by reference as if set forth herein verbatim.

99.     The actions of Defendants constituted fraud.  Defendants wrongfully represented that it did not have sufficient assets to satisfy Plaintiffs' judgment or post an appeal bond when in fact such sworn facts were false and untrue.  Defendants knew of its ongoing scheme to defraud creditors and knew that it had sufficient assets to satisfy Plaintiffs' judgment and otherwise post an appeal bond.  Had Defendants told the state court the truth, an appeal bond would have been required to be posted and there would be sufficient assets available to satisfy Plaintiffs' judgment.   Defendants used these false representations to wrongfully induce the state court judge to not require an appeal bond.  The representations were material to the state court not requiring an appeal bond.  At the time of making these false statements concerning its financial condition, Defendants knew such representations were false or made the representations with a reckless disregard for whether the statements were  true or not.  Defendants made such representations with the intent that Plaintiffs and the state court judge would rely upon such representations.  Plaintiffs and the state court judge in fact actually and justifiably relied upon the representations that Defendants were insolvent and unable to post an appeal bond or otherwise satisfy the state court judgment.  Therefore, Defendants are liable to Plaintiffs for defrauding Plaintiffs plus punitive damages as allowed by law.  Such fraud proximately caused damages to Plaintiff.

* * *

WHEREFORE, Plaintiffs pray for judgment as follows:

A.  Piercing the corporate veils of the Defendant entities and holding each liable for the debts and obligations of the former operating companies in order to satisfy the judgment entered against the operators, including Plaintiffs' judgment in the amount of $250,000 plus taxable costs

49

of $2,175.96 plus post judgment interest allowed by law until properly paid based on all theories of liability pleaded herein;

    B.  The avoidance/value of the fraudulent transfers and obligations as authorized by the Texas Business & Commence Code §24.008;

    C.  Declaring the transfer of real property and rents to Schron and Schron Entities be null and void to the extent sufficient to satisfy the claims herein;

    D.  For exemplary or punitive damages against each Defendants jointly and severally in an amount to be determined but in no event less than 3,000,000;

    E.  For attorney's fees, including pursuant to Tex. Bus. & Com. Code Ann. § 24.013, as well as costs of suit;

    F.  Pre- and post-judgment interest at the highest rates allowed by law; and

    G.  Such other and further relief as is just and proper.

Respectfully submitted,

**DOLLINGERLAW**

/s/ e-signed by scot g. dollinger ❼
**SCOT G. DOLLINGER**
State Bar No. 05961300
Southern District Bar No. 12224
700 Gemini, Suite 120
Houston, Texas 77058
281-488-4600
281-488-4643 Fax
scot@callthelaw.com
www.callthelaw.com
**ATTORNEYS FOR PLAINTIFFS**
**GLADYS ROBBINS, ET AL.**

## CERTIFICATE OF SERVICE

Pursuant to and in conformity with Fed. R. Civ. P. 5(a) and Fed. R. Civ. P. 5(b) by signing below I hereby certify that on the <u>4th</u> day of <u>January</u>, 2013, I have served a copy of **FIRST AMENDED COMPLAINT** with the attached exhibits and orders (if any) as indicated below:

**x**      by electronic transmission [Fed. R. Civ. P. 5(b)(2)(D) & (E) & 5(b)(3)], [LR 5.1(d)] [NDTX], [LR CV-5(a)(3)(A)][EDTX], [LR 5.1][SDTX], [LR 5(b)][WDTX]

to the following unrepresented parties (if any) and attorneys of record:

ROBERT A. WILKINS
SBN:  24033343
JARED LEVINTHAL
SBN:  24002467
LEVINTHAL WILKINS & NGUYEN PLLC
1111 BAGBY, SUITE 2610
HOUSTON, TEXAS 77002
713-275-9700
713-275-9701 FAX
713-775-8945 CELL
Rwilkins@lwnfirm.com
Jlevinthal@lwnfirm.com
Www.lwnfirm.com
**ATTORNEYS FOR THE SCHRON DEFENDANTS**

LORI PROCTOR
SBN: 16682400
SERPE, JONES, ANDREWS, CALLENDER & BELL, PLLC
AMERICA TOWER
2929 ALLEN PARKWAY, SUITE 1600
HOUSTON, TEXAS 77019
713-452-4400
713-452-4499 FAX
ldproctor@proctor-law.com
**ATTORNEYS FOR DEFENDANT**
**MARINER HEALTH CARE OF NASHVILLE, INC.,**
**D/B/A/ MARINER HEALTH OF SOUTHWEST**
**HOUSTON**

DAVID A. BAAY
SBN:  24027050
FIDN:  598715
KENT C. SULLIVAN
SBN:  19487300
STEPHANIE KINZEL-TAPPER
SBN:  TBN 24055781
**SUTHERLAND ASBILL & BRENNAN LLP**
1001 FANNIN STREET, SUITE 3700
HOUSTON, TEXAS 77002
TELEPHONE: (713) 470-6100
FACSIMILE: (713) 654-1301
Kent.sullivan@sutherland.com
David.baay@sutherland.com
Stephanie.kinzel-tapper@sutherland.com
**ATTORNEYS FOR THE SAVA DEFENDANTS**

/s/ e-signed by scot g. dollinger ❷
Scot G. Dollinger